Filed 11/15/23  P. v. Jaghama CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FALEH IBRAHAM JAGHAMA,<br><br>    Defendant and Appellant. | F085150<br><br>(Super. Ct. No. BF124909A)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion herein filed on November 15, 2023, be modified as follows:

1.  On page 1, in the caption, delete the word "**DRAFT**" before "**OPINION**."

This modification does not effect a change in the judgment.

HILL, P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FALEH IBRAHAM JAGHAMA,<br><br>    Defendant and Appellant. | F085150<br><br>(Super. Ct. No. BF124909A)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  Chad A. Louie, Judge.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ian Whitney and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

"There are 'two sources of citizenship, and two only: birth and naturalization.' " (*Miller v. Albright* (1998) 523 U.S. 420, 423.) The Immigration and Naturalization Act (INA) confers "derivative citizenship" on children of naturalized citizens under certain statutorily prescribed conditions. (*Minasyan v. Gonzales* (9th Cir. 2005) 401 F.3d 1069, 1075.)

Appellant Faleh Ibraham Jaghama (appellant) was born in Jerusalem, Palestine and entered the United States in 2005 when he was 18 years old under a petition filed by his father who was a naturalized citizen. Appellant believed he became a citizen based on his father's status. Under the applicable law, however, appellant only could have received derivative citizenship if he had been *under* the age of 18 years when he arrived in the United States under his naturalized father's sponsorship (8 U.S.C. § 1431(a)).

In 2005, appellant was living with his family in Bakersfield and applied for a United States passport, based on his belief that he became a citizen as a result of his father's naturalized status. There is no evidence appellant committed fraud or perjury when he applied for the passport. It is undisputed the United States Department of State (the Department) issued a valid United States passport to appellant in 2006. Under federal law, "Congress authorized passport holders to use the passport as conclusive proof of citizenship." (*Magnuson v. Baker* (9th Cir. 1990) 911 F.2d 330, 333.)

In 2008, appellant was charged with and pleaded no contest to one felony count of violating Penal Code section 288, subdivision (a),[1] commission of lewd and lascivious acts on a child under the age of 14 years and was sentenced to three years in prison. The INA "renders deportable any alien convicted of an 'aggravated felony' after entering the United States. [Citation.] Such an alien is also ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[Citation.] Accordingly, removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here." (*Sessions v. Dimaya* (2018) __ U.S. __ [138 S.Ct. 1204, 1210–1211; 200 L.Ed.2d 549].) A conviction for violating section 288, subdivision (a) constitutes an aggravated felony under federal immigration law. (*United States v. Baron-Medina* (9th Cir. 1999) 187 F.3d 1144, 1145; *United States v. Medina-Villa* (9th Cir. 2009) 567 F.3d 507, 512.)

At the times of his plea and sentencing, however, appellant still retained his passport and had never been advised by any governmental agency that it had been erroneously issued. Appellant declared that prior to the plea, he showed his passport to his defense attorney, who said it was great that he was a citizen. As a result, they never discussed possible immigration consequences that could result from a criminal conviction, or whether they should negotiate for a plea to an immigration-neutral offense, because they both believed he was a citizen of the United States based on his valid passport. "United States citizens are not subject to deportation, exclusion, or denial of citizenship regardless of the quantity or quality of crimes they may commit." (*People v. Suon* (1999) 76 Cal.App.4th 1, 5.)

Shortly before appellant was released from prison, he was advised that an immigration hold was placed on him and then withdrawn. He was released on parole in 2011 and returned to Bakersfield. In 2012, appellant was notified by the federal government for the first time that it had erroneously issued his passport and demanded that he surrender it. Appellant complied and surrendered his passport. In 2014, appellant was arrested by immigration agents and found out for the first time that he was going to be deported because of his criminal conviction.

In 2022, appellant filed a motion to vacate his conviction pursuant to section 1473.7, subdivision (a)(1), that states a person who is "no longer in criminal custody may file a motion to vacate a conviction or sentence" because "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability

3.

to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).)

In support of his motion, appellant declared he failed to meaningfully understand the potential immigration consequences of his plea, and his error was prejudicial because he reasonably believed he was a United States citizen since he still had his passport at the time of his plea. The trial court considered the parties' declarations and documentary exhibits, conducted an evidentiary hearing where appellant testified, and acknowledged the case presented a "unique" situation because appellant reasonably believed he was a citizen since he had the passport. However, the court denied appellant's motion and found his error was not prejudicial because his primary concern at the time of his plea was to minimize the time he spent in custody, he admitted the victim's allegations during the investigation, and he would not have received a more favorable, immigration-neutral plea or a better result if he went to trial.

On appeal, appellant argues he met the burden required by section 1473.7 to show he made a prejudicial error that affected his ability to meaningfully enter his plea because he reasonably believed he was a citizen since he had a valid passport.

We agree, find appellant's motion should have been granted, and remand for further appropriate proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### Appellant's Entry into the United States

Appellant was born in Jerusalem in 1987. His parents divorced when he was 10 years old, his grandmother primarily raised him, and he graduated high school in Jerusalem.

---

[2] The factual and procedural background is taken from the following pleadings that were considered by the trial court when it heard and denied appellant's section 1473.7 motion to vacate: declarations filed by appellant and Myra Azucena, his immigration attorney, in support of appellant's motion to vacate; documentary exhibits filed in support of appellant's motion and

4.

In 1993, appellant's father moved to the United States. In 2004, his father became a naturalized citizen. Appellant was still a minor and remained in Jerusalem where he graduated high school.

In August 2005, appellant entered the United States as a legal permanent resident through a petition filed by his father. Appellant was 18 years old. He arrived with his older sister and stepmother, and they lived with his father in Bakersfield. Appellant's birth mother lived in Chicago. By 2008, appellant's stepmother was a citizen. Appellant's grandmother remained in Jerusalem and died there in 2007.

In his supporting declaration to his motion to vacate his conviction, appellant stated:

> "Not long after my arrival into the U.S., I was informed by my mother that under U.S. immigration law, if a father becomes a U.S. citizen prior to his children reaching the age of eighteen (18) years old then those children automatically also become U.S. citizens. My father had obtained U.S. citizenship prior to me turning eighteen (18), thus all of these conditions applied to my situation, so what my mother told me led me to the belief that I had automatically become a U.S. citizen."

Appellant declared his primary language was Arabic, his second language was Hebrew, and his third language was English. While he completed high school in Jerusalem, he "was not sophisticated or had any experience in American immigration law or legal principles." "Thus, when my mother had told me about the American law that automatically made me a U.S. Citizen, I had no reason to disbelieve her or sufficient ability to think that she was incorrect."

---

the People's opposition; the record of appellant's criminal conviction; and appellant's testimony at the evidentiary hearing on his motion to vacate.

**Appellant Applies for and Receives a Passport**

Appellant declared that "based on the belief and understanding that I had automatically become a U.S. citizen, on or about December 2005 I applied to the U.S. federal government for a U.S. passport."[3]

It is undisputed that in 2006, the Department issued a valid United States passport to appellant.

Appellant declared he was excited when he received his passport because "[b]ased on my cursory understanding of U.S. immigration law only U.S. citizens could obtain a valid U.S. passport, and conversely non-citizens were not eligible to obtain a passport. The fact that I was successfully issued a valid United State[s] passport after applying for one cemented my belief that what my mother had told me about automatically becoming a U.S. citizen was correct, and that I had in fact automatically become a U.S. citizen." Appellant also lawfully obtained a Social Security number and a California driver's license.

Ms. Azucena, appellant's immigration attorney, declared appellant applied for the passport "under the belief that he derived citizenship from his parents because he was 18 years old when he entered the U.S." Appellant's application was based on the provisions of the INA "which allows a person [to] derive citizenship after birth from a U.S. citizen parent if the child was admitted into the U.S. as a legal resident prior to their 18th birthday."

Ms. Azucena declared the Department issued the passport to appellant, and "[t]he *Department ... will only issue U.S. passports to U.S. citizens.* There is no other immigration status in which a person could be issued a U.S. passport." (Italics added.)

---

**3**    At the evidentiary hearing, the district attorney stated he had obtained appellant's passport application from the Department, and it showed appellant filed the application in October 2005.

"Because [appellant] was issued a U.S. passport, *he would have no reason to believe that he was not a citizen at the time he [entered] his plea*." (Italics added.)

## APPELLANT'S CRIMINAL CONVICTION

Appellant's criminal conviction resulted from the following proceedings in 2008 and 2009.

### Facts of the Underlying Offense[4]

On September 8, 2008, a deputy was dispatched on a report of child molestation and met with the mother of a 12-year-old victim, referred to as John Doe. The mother reported appellant was her boyfriend, and he inappropriately touched Doe.

The deputy spoke to Doe, who said that during the summer of 2008 when his mother went to work, appellant would show up at Doe's residence. Appellant would sit down on the bed next to him, kiss his shoulder and neck, kiss him on the lips, and bite his lower lip. Doe said appellant would lie on top of him at times. Doe was asked if appellant was excited when kissing him. Doe said, "Yes," and that appellant had an erection.

Doe stated one incident happened at appellant's apartment, when appellant rubbed Doe's legs and back while pushing down on his pants. Appellant "rubbed [Doe's] back while moving his pants down his legs and then began rubbing his buttocks. While rubbing his legs, [appellant] was touching [Doe's] inner thigh and then [appellant] brushed his hand against Doe's testicles. Doe stated he told [appellant] to stop and [appellant] complied."

Doe stated the incidents happened too many times to keep track. Sometimes it happened every day, then stopped for a week, and then started again.

---

**4** The following facts are from the probation report, which summarized a report from the Kern County Sheriff's Office. At his plea hearing, appellant stipulated to the "police report" as the factual basis for his plea. We recite these facts to give context to the issues raised by the parties in this appeal and not for the truth of the matter.

7.

Also on September 8, 2008, appellant was taken into custody. When asked if he knew why he was in custody, appellant said, "Child molesting." Appellant said four molestations had occurred with Doe. Appellant said the first time was in June 2008, and he admitted he pulled down Doe's pants and underwear and rubbed Doe's buttocks. He said the second incident was about three weeks later, when Doe was lying on his bed and appellant rubbed Doe's thighs and penis. Appellant said the third and fourth incidents occurred when he laid on top of Doe, kissed him, and they both had erections. Appellant stated that when he was seven years old, he was molested by his uncle over a three-month period and never told anyone about it.

**The Charges**

On September 18, 2008, a felony complaint was filed in the Superior Court of Kern County charging appellant with count 1, commission of lewd and lascivious acts on a child under the age of 14 years (§ 288, subd. (a)), occurring on or about and between June 1 and September 1, 2008.

Appellant did not have any prior convictions. As explained above, however, a conviction for violating section 288, subdivision (a) constitutes an aggravated felony within the meaning of the INA to trigger a noncitizen's deportation and exclusion. (*United States v. Baron-Medina*, *supra*, 187 F.3d at p. 1145.)

**Plea Proceedings**

On October 30, 2008, Judge Colette M. Humphrey convened the scheduled pre-preliminary hearing. Appellant appeared with his retained attorney, Benjamin Greene.[5]

The court stated that appellant had agreed to a negotiated disposition and would plead no contest to the charged felony offense based on an "understanding he would

---

[5] Mr. Greene, appellant's retained counsel for his plea, died in 2017. Appellant retained Joseph Tang to file his section 1473.7 motion to vacate his conviction in the trial court. As part of the instant motion to vacate, Mr. Tang filed a supporting declaration stating that after he determined Mr. Greene had died, he repeatedly contacted Mr. Greene's widow to determine if appellant's case file still existed. She never responded to his numerous telephone calls or letters.

receive no more than three years in state prison," and the matter would be referred for a section 288.1 psychological evaluation to determine if he was suitable for probation.**6**

The court asked appellant if he signed the waiver of rights form, and appellant said, "Yes." The court asked appellant if he went through his constitutional rights with his attorney, understood those rights, and waived those rights, and appellant said, "Yes." Appellant's attorney joined in the waiver. The parties stipulated to the "police report" as the factual basis for the plea.

Thereafter, appellant pleaded no contest to the charged felony violation of section 288, subdivision (a). The court vacated the preliminary hearing, referred the matter to the probation department, set a sentencing hearing, and noted the matter would be referred to a doctor for a section 288.1 psychological evaluation.

**Section 1016.5 Immigration Advisement**

During the plea hearing, the trial court did not verbally advise appellant about the possible immigration consequences of his plea. However, appellant and his attorney signed an advisement and waiver of rights form on the same day as his plea hearing, and appellant acknowledged to the court that he understood the rights set forth in the form.

One paragraph in the form was titled "**ALIEN STATUS**" and stated the immigration advisement required by section 1016.5: "I understand that if I am not a Citizen of the United States, my guilty or no contest plea will result in my deportation, exclusion from admission, or denial of naturalization pursuant to the laws of the United States." Appellant initialed this paragraph.**7**

---

**6** Section 288.1 states: "Any person convicted of committing any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years shall not have his or her sentence suspended until the court obtains a report from a reputable psychiatrist, from a reputable psychologist who meets the standards set forth in Section 1027, as to the mental condition of that person."

**7** Section 1016.5 "requires that before accepting a plea of guilty or nolo contendere to any criminal offense, the trial court must advise the defendant that if he or she is not a United States

**The Section 288.1 Psychological Evaluation**

On January 6, 2009, Dr. Eugene Couture, a clinical neuropsychologist, filed the section 288.1 psychological evaluation with the court and reported about his interview with appellant, who was 21 years old.

The report stated appellant was comfortable speaking English and was "generally understandable." Appellant said he was "able to obtain a visa to come to the United States in only forty days" and that "it usually takes four years." He "was not aware of why his visa was approved so quickly." Appellant "moved to the United States at age 18," in 2005, and noted "that his father was a citizen in the United States."

Appellant said he started attending Bakersfield College in 2006 to continue his education, but his father accused him of being selfish, and he had to quit school. Appellant worked with his father in door-to-door sales. His father accused him of stealing when he tried to spend some of his earnings, and appellant stopped working with him. Appellant moved to Arizona, Ohio, and Illinois, where he worked for family and friends, and complained he did not make much money. In 2007, he returned to Bakersfield and got a job working for one employer at three convenience stores. Appellant said he was such a good worker that his employer did not fire him when he was initially taken into custody in this case.

Appellant's father had heart surgery in May 2008, had been disabled, and was gradually returning to work at a gas station. Appellant "complain[ed] bitterly about how other people do not care for him and his gross feelings of abandonment by all members of his family."

---

citizen, conviction of the offense *may result* in deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (*People v. Martinez* (2013) 57 Cal.4th 555, 558, italics added.) A validly executed waiver form is a proper substitute for verbal admonishment by the trial court of the section 1016.5 advisement. (*People v. Ramirez* (1999) 71 Cal.App.4th 519, 521–523.)

Appellant said he became involved in a dating relationship with Doe's mother in March 2008, and they did not live together. Appellant became sexually involved with Doe that summer. When asked about the molestations, appellant "seriously minimized his involvement and while minimizing his involvement, he complained that he himself had been molested and that his birth family ignored him and expected too much of him." Appellant denied most of the behaviors and feelings of arousal about Doe that he previously admitted.

Dr. Couture diagnosed appellant with pedophilia. Appellant was not entirely truthful about the charged offense but admitted he was very troubled about his actions with Doe. Dr. Couture concluded appellant was a danger to the health and safety of others. There was an order for appellant to stay away from Doe and he was complying with that, but he had also started seeing Doe's mother again after entering his plea.

Dr. Couture stated probation was not appropriate, and recommended the court commit appellant to either Coalinga or Atascadero State Hospital for intensive inpatient treatment.

**The Probation Report**

On March 26, 2009, the probation report was filed but contained errors about appellant's age and entry into the country. The report stated appellant was born in Jerusalem in *2008* and arrived in the United States in *2005*, whereas the record shows he was born in 1987 and entered the United States in 2005.

The probation report also contained the following statement: "<u>Citizenship</u>: U.S."

Appellant was not married, did not have any children, and did not have any known prior criminal record. The report stated appellant was employed as a cashier at the convenience stores since 2008.

Appellant admitted to the probation officer that he committed the molestations and wanted help for his " 'problem.' "

The report stated appellant was unsuitable for probation based on his conduct toward Doe, and he should be sentenced to the lower term of three years in prison.

**Sentencing Hearing**

On March 26, 2009, Judge Humphrey convened the sentencing hearing. Appellant appeared with his attorney, Mr. Greene.

Pamela Riel, a therapist with Kern County Mental Health, testified for appellant that he voluntarily initiated therapy and she had seven sessions with him from December 2008 to March 2009. Appellant was compliant and eager to attend the sessions. Ms. Riel testified appellant was not completely in denial and had not tried to rationalize his behavior as a pedophile, but he needed ongoing and long-term treatment to understand himself and his diagnosis. Ms. Riel agreed with Dr. Couture's conclusions about appellant.

Doe's mother addressed the court and stated Doe was in counseling and needed help because he had trusted appellant as a father. She stated appellant should be punished but he also needed psychological help.

John Lua, the prosecutor, acknowledged that when appellant entered his plea, the parties agreed there would be a section 288.1 psychological evaluation to determine if he was suitable for probation. Mr. Lua argued the three-year prison sentence discussed at the plea hearing was appropriate because appellant took advantage of a position of trust with Doe, who suffered emotional and psychological harm from the molestation. In addition, appellant minimized his conduct when he was interviewed by Dr. Couture, and he refused to take full responsibility for his actions.

Mr. Greene acknowledged appellant committed misconduct and deserved to be punished, but he should be sent to jail and not to prison. Mr. Greene argued appellant was suitable for probation because he did not have a criminal record, admitted his guilt when initially contacted by law enforcement, voluntarily sought counseling, and felt remorse for his actions.

The court noted that Ms. Riel agreed with Dr. Couture's conclusions about appellant, that appellant should receive inpatient treatment, and that he took advantage of a position of trust with Doe. The court found mitigating circumstances that appellant had no known prior record, admitted his guilt upon arrest, and entered a plea early in the proceedings.

The court found appellant was not suitable for probation and imposed the lower term of three years in state prison. The court ordered appellant to register as a sex offender and not to have any contact with Doe. The court stated that consistent with Dr. Couture's recommendation, appellant should be housed at either Coalinga or Atascadero State Hospital for intensive treatment for pedophilia.

## APPELLANT'S DECLARATION ABOUT HIS IMMIGRATION STATUS AT THE TIME OF HIS PLEA

In his declaration filed in support of his motion to vacate his conviction, appellant stated he had been living with his father, stepmother, sister, and half-sister in Bakersfield at the time of his plea in 2008. He was working full time as a gas station clerk. He was the only person financially supporting his entire family because his father was disabled after heart surgery, and no one else in the family worked. Appellant was "fully responsible" for paying the family's rent and living expenses.

Appellant's declaration stated that prior to entering his plea, he showed his passport to Mr. Greene, his attorney:

> "During his representation of me, Mr. Greene had inquired as to my immigration status. In response, I told him that I was a U.S. citizen. *I also showed him my U.S. passport that I had at the time*. In substance, his response was essentially 'great, you're a U.S. Citizen', and that was the extent of any discussion that he and I had about my immigration status during the course of his representation of me. As a result, Mr. Greene never discussed or brought up the subject of immigration consequences at all. Mr. Greene did not even make me aware that non-citizen defendants could possibly face any kind of adverse immigration consequences for criminal convictions generally." (Italics added.)

13.

Mr. Greene did not attempt to "negotiate an alternative immigration-safe plea deal, nor did we ever discuss" a deal for appellant to serve more time in prison that would be immigration safe, or possibly going to trial. Appellant did not consult with an immigration attorney before he entered his plea.

Appellant declared he was in possession of his United States passport when he entered his plea in this case. He had never received notice from any governmental agency that he was not a citizen, or that the passport was mistakenly issued to him, and stated:

> "I reasonably believed in good faith that I was in fact a U.S. citizen. The primary reason for my good faith belief that I was a U.S. citizen, and why that belief was reasonable … is because the U.S. federal government had mistakenly accepted my application for and issued me a valid U.S. passport by mistake prior to the [criminal charges]."

Appellant recalled there was an immigration warning in the advisement and waiver form that he signed before he entered his plea. Appellant declared that based on his good faith belief that he was a citizen, he did not believe there was any possibility that entering a plea in this case would result in his deportation, exclusion, or other immigration consequences "because I objectively believed that I was a U.S. citizen," and "I did not believe that this admonishment applied to me." Appellant believed the federal government could not deport or remove individuals once they obtained citizenship, even for a criminal conviction, so he was not concerned about possible immigration consequences and did not investigate what those consequences would be, "since I believed at that time that I was a U.S. citizen, and thus could not be deported."

## WITHDRAWAL OF APPELLANT'S PASSPORT AND INITIATION OF IMMIGRATION PROCEEDINGS

After appellant was sent to prison, his father and the entirety of his family moved from Bakersfield to Chicago.

14.

In 2011, approximately 90 days before his scheduled release on parole, appellant was notified "by prison personnel" that United States Immigration and Customs Enforcement (ICE) had placed an immigration hold on him. While he was still in prison, however, he was advised that ICE had released the immigration hold because it concluded he was "a naturalized U.S. citizen."

In October 2011, appellant was released on parole and returned to Bakersfield. He still retained his United States passport and had not received any notice that the passport was erroneously issued or suspended. Appellant obtained a full-time job at a convenience store. He was not arrested, charged, or convicted of any other criminal offenses.

In 2012, appellant's family in Chicago advised him that the federal government sent a letter to appellant directed to their address in Chicago. The letter stated appellant's passport "had been suspended because the government stated that *they had issued it to* [*appellant*] *by mistake*" and "commanded [appellant] to surrender the mistakenly issued U.S. passport back to the federal government." (Italics added.) Appellant complied and surrendered his passport by mailing it to a federal agency, as directed in the letter.

**Appellant's Immigration Arrest**

On July 15, 2014, appellant was arrested at his residence in Bakersfield and taken into custody by the Department of Homeland Security (DHS) for immigration proceedings and deportation because of his 2008 criminal conviction. Appellant declared he was arrested "without any advance warning," and the agents advised him that he was being placed into deportation proceedings because he was not a citizen and had the prior felony conviction. As he was being arrested, appellant told the agents that he was a naturalized citizen and asked them to gather and take possession of documents in his residence that supported his claim of citizenship.

DHS's report about appellant's arrest stated appellant was admitted to the United States as a legal permanent resident in August 2005, and he had a driver's license and

15.

Social Security card. DHS's report further stated that appellant was not a citizen of the United States, and his passport was "erroneously issued" and subsequently surrendered back to the Department.

After his arrest, appellant retained Ms. Azucena as his immigration attorney, and she obtained certain documents and advised him that he was never a naturalized citizen. As a result of the information from Ms. Azucena, appellant learned for the first time that he was never granted citizenship "because I had not entered into the U.S. before my 18th birthday, and that my conviction in this matter made me removable from the U.S., and that the U.S. federal government was seeking to deport me for that reason."

Ms. Azucena declared she obtained appellant's records from DHS and ICE, and the records "corroborate[ ] his claim and show[ ] that the Department … *had erroneously issued* [*appellant*] *a U.S. passport*." (Italics added.)

Appellant received a notice dated March 7, 2022, that his case was scheduled for a hearing before the immigration court on November 16, 2022.

## APPELLANT'S SECTION 1473.7 MOTION TO VACATE

On August 5, 2022, appellant filed a section 1473.7, subdivision (a)(1) motion to set aside his no contest plea from 2008 and vacate his conviction for violating section 288, subdivision (a). Appellant argued his plea was invalid because he reasonably believed he was a citizen since the federal government issued a valid passport to him, his erroneous belief was prejudicial because it damaged his ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea to the charged offense, and he would not have entered his plea if he had known of the adverse immigration consequences.

**Supporting Declarations**

As explained above, appellant's motion was supported by declarations filed by appellant and Ms. Azucena, who stated appellant was at that time in immigration removal proceedings as a result of his prior conviction, and the proceedings were pending the

16.

result of his motion to vacate his conviction. Ms. Azucena declared his conviction for violating section 288, subdivision (a) constituted an "aggravated felon[y]" for immigration purposes, "which makes him nearly ineligible for any statutory relief before the immigration court."

Appellant's declaration addressed the circumstances for his entry into the United States, his receipt of the passport, and the reasons he believed he was a citizen when he entered his plea, as set forth above. Appellant declared that even "years after my conviction," he did not know his plea would have adverse immigration consequences and believed he was a citizen.

Appellant declared the federal government alleged he was never a citizen, and he was subject to removal because of his prior conviction. Appellant declared he did not have any other prior convictions, and he filed the instant motion to vacate his conviction and "begin my case over again, so that I can either obtain an alternative immigration safe disposition, or have my matter decided by a jury at trial with the hope of being found not guilty."

Appellant declared that at the time of his plea that he "did not meaningfully understand, was unable to defend against, or knowingly accept the actual or potential adverse immigration consequences of my no contest plea." If he had known about his true immigration status, he would have "fought for an alternative immigration-safe plea deal or chosen to go to trial to fight my case. I would not have accepted any plea deal which would have resulted in my conviction if I knew that it would result in permanently leaving my family and life in America and being deported back to Palestine."

Appellant further declared that if he faced deportation, he would have "no choice" but to return to an area of Jerusalem that, "as a practical matter," was controlled by extremist militia groups. His situation would be "calamitous" because his conviction for committing a sex crime against a child could result in his torture or death by these groups. Appellant declared the same practices and punishments against people accused

of sexual crimes against children "still continue to this day," and he would fear for his life, which was "another reason why I wish to vacate my conviction now that I know there are adverse immigration consequences for me due to my no contest plea in this matter."

Appellant declared his family was "tight knit," and he always had "a close relationship" with his father and the rest of his family. He felt "a strong duty" to care for and support his father and the family. "Even if had to do a state prison sentence for a number of years, I still did not want to permanently leave the U.S. and my family behind, and potentially never see them again or … be unable to take care of my father. I still wanted to remain in the U.S. after I fulfilled my prison sentence in order to take care of him."

Finally, appellant declared if he had known about his citizenship status and the adverse immigration consequences at the time of his plea, he would have immediately rejected the plea bargain. He would have consulted with an immigration attorney and directed his attorney to negotiate an immigration-safe plea agreement, even if it meant serving additional time in prison, or gone to trial and accepted the risk of a higher prison term.

**The People's Opposition**

On October 10, 2022, the district attorney filed opposition to appellant's motion to vacate his conviction, requested an evidentiary hearing, and objected to any consideration of appellant's "self-serving" declaration unless he was available for cross-examination at the evidentiary hearing.

The district attorney further argued appellant was unable to show prejudice as required by *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*) based on: his statements to Dr. Couture in the section 288.1 psychological evaluation, where he minimized the conduct he had already admitted to the investigating officers; he was diagnosed with pedophilia; and his priority at the time of his plea was for less jail time so he could take

18.

care of his family.  As a result, appellant could not show that he had reason to believe an immigration-neutral plea was possible because of the strength of the case against him.

## THE EVIDENTIARY HEARING

On October 18, 2022, Judge Chad A. Louie conducted an evidentiary hearing on appellant's section 1473.7 motion.  Appellant was present with his attorney, Mr. Tang.

The parties had agreed they would submit on the pleadings and documents, the court could take judicial notice of the file from appellant's criminal case, and appellant would be the only witness.  Brandon Stallings, the deputy district attorney, had obtained appellant's application for the passport from the Department, and it could be considered by the court but not be released or introduced into evidence.

**Appellant's Testimony**

Appellant was called by Mr. Stallings and the only witness at the evidentiary hearing.  Appellant testified he was living in Jerusalem when his father became a naturalized citizen, but he knew that his father had to hire an attorney, take a test, and then take an oath at a ceremony.

Appellant testified he arrived in the United States in 2005 and obtained cursory knowledge about how to become a citizen by talking with family and friends.  He did not obtain information from any governmental agencies.

Mr. Stallings asked appellant to review his application for a passport, and appellant acknowledged he filed the application in October 2005.  Appellant testified he was not fluent in English at the time, his father helped him fill out the application, and appellant wrote down most of the information.  Upon reviewing the application, appellant conceded he did not answer the questions about whether his mother and father were citizens and believed the federal government knew his father was already a citizen.[8]

---

[8]     As will be discussed below, the district attorney did not introduce any evidence that appellant committed fraud or perjury in his passport application and did not raise that argument at the evidentiary hearing.

19.

In response to Mr. Stallings's questions, appellant testified he never took a test or an oath to become a naturalized citizen as his father did, but believed he became a citizen based on his father's status, based on information provided to him by his family. Appellant did not verify this information with any agency of the federal government.

Mr. Stallings asked appellant about his conversations with Mr. Greene, his defense attorney during the criminal case. Appellant testified Mr. Greene asked about his immigration status shortly after he retained him, and appellant showed his passport to Mr. Greene. "I recall we didn't discuss it extensively because I showed him my American passport, which to me was a valid American passport, and he said in the context[ ] of his comment was, 'Oh, great you're a [United States] citizen.' And that was the extent of it."

Appellant told Mr. Greene how important it was for him to remain in the United States. Mr. Greene told appellant that he would not be affected, and it was not an issue because he was an American citizen. Mr. Stallings asked, and appellant answered:

> "Q. Did you make it an issue?
>
> "A. I didn't believe I had an issue with immigration.
>
> "Q. Did you tell Mr. Green[e] at any point you believed your life would be jeopardized if you were sent back to Israel at [th]is point?
>
> "A. Again, we didn't raise that issue because I didn't believe I was facing immigration."

Appellant testified the plea offer was "the best deal" he could get because he could receive probation or the lower term of three years. Appellant decided to take the plea instead of going to trial.

Appellant testified he signed the immigration advisement in the plea advisement and waiver form, and knew it said his conviction could result in deportation, but believed it was "a formality for a [United States] citizen just [to] sign." Appellant believed he was

20.

a citizen because he had the passport, and he "came to an agreement" with Mr. Greene that the "immigration portion of this case … did not effect [*sic*] my status."

Mr. Stallings asked appellant if Mr. Greene went over the police reports and reviewed appellant's admissions that he committed the charged acts.  Appellant said he admitted committing four acts against Doe.  Mr. Greene told appellant it was a fairly strong case against him, and the possible sentences for the violation of section 288, subdivision (a) were three, six, or eight years.  Appellant attended counseling sessions after the plea and hoped to receive probation and a more lenient sentence.

Appellant testified he was released from prison as scheduled in October 2011.  About 90 days before his release, appellant was notified that ICE placed an immigration hold on him.  He did not retain an immigration attorney because "the counselor of the dorm [in prison] explained to me that it's a procedure that the prison system does that to make sure that everybody's legal status of this country is a citizen.  Or if not citizen, they will be deported."  The immigration hold was lifted before he was released from prison, and he was told by prison officials that ICE determined he was a naturalized citizen.  After he was released from prison, appellant did not contact an attorney because ICE lifted the immigration hold and that "cemented my belief that I was [a United States] citizen in prison."

Appellant testified his passport was revoked in 2012.  The Department sent a letter to appellant at his family's address in Chicago, based on his father's change of address form, and his family advised him about the letter and sent it to him in Bakersfield.  The letter notified appellant that his claim of citizenship based on his father's status was invalid because he was over 18 years old when he entered the United States.  Appellant consulted an attorney about the letter and was told it was probably because he was on parole.

Appellant testified he was arrested at his home in Bakersfield by immigration agents in 2014, and advised he was subject to deportation because of his plea in the prior

case. Appellant still believed he was a citizen, and asked the agents to collect his documents in the house that showed he was a citizen. Appellant testified he only realized he was not a citizen when "the immigration Judge explained the law to me and how you have to be under the age of 18 [years] to enter the United States … to become a [United States] citizen."

Appellant testified his immigration case began in 2014, and he retained Ms. Azucena as his immigration attorney. He told her that he was concerned about being deported to Israel, and she said that would not happen. He did not ask her to file a motion to withdraw his plea in 2014 because that did not occur to him, and he just followed what his attorney said to do. Appellant did not contact Mr. Greene to ask him to file a motion to withdraw his plea; Mr. Greene died in 2017. Appellant called different attorneys who told him that he could not reduce his felony conviction to a misdemeanor.

**The Parties' Arguments**

After appellant testified, the court invited argument on whether appellant met his burden to show prejudicial error as required by section 1473.7, subdivision (a)(1), damaging appellant's ability to meaningfully understand or knowingly accept the actual or potential adverse immigration consequences from his conviction.

Mr. Stallings argued appellant failed to show prejudice because he had no reason to believe an immigration-neutral plea was possible in this case, more serious charges could have been filed, and there was no objective evidence to corroborate his claim that he would not have entered the plea if he had known it would lead to deportation. Mr. Stallings argued evidence from the plea proceedings showed appellant placed "great weight on receiving a minimized sentence and, in fact, pled to a low term lid where … there was a potential of him receiving felony probation, which was important to him, and we can also see that through reading his declaration *where his goal was to stay out of custody and was to work to provide for his family*." (Italics added.)

22.

Mr. Stallings acknowledged appellant believed he did not have any immigration issues, but argued appellant's belief was unreasonable because he knew his father had to go through a certain procedure to become a naturalized citizen, and appellant did not take a test or an oath:

> "[D]efendant essentially blindly went ahead with this belief that he was a citizen despite all of these … war[n]ing signs along the way. The first in 2011 when he was in prison custody. In 2014 when he was arrested by ICE. All along the way there [are] warning signs, and [appellant] still … had a blind belief that he was, for whatever reason, a Naturalized citizen. The letter that was sent to him in 2012 clearly states that he was not a Naturalized citizen … because of the age … when he entered in the United States, that he … could not have been issued a passport because he was over the age of 18. But even though he was specifically notified of the Federal Government[']s ruling in where their determination regarding his passport, he took no steps when he was arrested by ICE, and then ultimately in 2014 *there is a*[*n*] *8*[*-*]*year gap before he actually filed any sort of motion to withdraw*. I think what the Court can do is … look at whether or not [appellant] actually holds a reasonable belief that he's been prejudiced by the deal. *I think that the record is that* [*appellant*] *buried his head in the sand despite … all of these warning signs. He did so because in his mind he prioritized that plea deal above all else*, and he was sticking with the plea deal and really does not appear to care about the immigration consequences until now here we are in 2022, and it is 14 years after he entered the plea. So I do think that does reflect on his credibility." (Italics added.)

The court interrupted and stated:

> "I believe that [appellant] believe[d] that he was a citizen. I think that's clear from the record that [he] believed that he was a citizen. He was told that by … at least one of his parents, that because he was a minor when his father bec[a]me a Naturalized citizen, then the law of this country would therefore make him a United States citizen. Then when he came to this country, he applies for [a] passport, gets a passport, which further confirmed his belief, in his mind, that he was a United States citizen. The question for this court that I need to decide is whether or not there was prejudicial error damaging [appellant's] ability to meaningfully understand, defend[ ] against, or knowingly accept the actual or adverse immigration consequences of the conviction of sentence."

The court stated that appellant "believed he was a citizen at the time he entered into the disposition in this case. And so whether or not [appellant] had reason to believe that the charges would allow for a[n] immigration[-]neutral bargain the court would accept, would not really apply in this case," since appellant believed he was a citizen. "I don't believe that [appellant's] aversion to immigration consequences would necessarily apply in this case either," because appellant's belief he was a citizen was corroborated by the existence of his passport.

Mr. Tang, appellant's counsel, argued his motion to withdraw was timely under section 1473.7, subdivision (b), because appellant had received notice of immigration proceedings and a final removal order had not yet been filed. Mr. Tang further argued that while Mr. Stallings focused on the fact that appellant never took a test or an oath to become a citizen, there would not have been a test or oath in the process for a minor's derivative citizenship through a parent. As stated in appellant's declaration, the stakes were so severe for him that it was reasonable that he would have literally done anything to avoid deportation if he had realized he was not a citizen, even if going to trial only gave him a 1 to 5 percent chance of being acquitted.

Mr. Stallings replied appellant failed to prove prejudice because he "took no steps to avoid deportation every step of the way," he gave excuses for failing to previously file a motion to withdraw his plea in the past 14 years, and his priority was to take advantage of a plea bargain in a very serious case, serve the least amount of jail time, and get out of custody.[9]

---

[9] Section 1473.7 was enacted in 2016, and became effective in 2017 (Stats. 2016, ch. 739, § 1), to permit defendants "who were unaware of the immigration consequences posed by a plea entered *many years earlier*" to subsequently move to vacate their convictions and obtain relief from imminent immigration orders. (*Vivar*, *supra*, 11 Cal.5th at p. 523, italics added.)

"[T]he Legislature created a strikingly generous timeliness standard for immigration-related petitions." (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 759 (*Alatorre*).) The motion "shall be deemed timely filed at any time in which the individual filing the motion is no longer in criminal custody" and the events stated in section 1473.7, subdivision (b)(2) have not yet

Mr. Tang argued the district attorney was ignoring the fact that appellant reasonably believed he was a citizen because he had a passport, and there would not be any immigration consequences because of the criminal conviction. When he found out there were consequences, he retained an immigration attorney. Appellant did not have a legal background, he was not required to decide what motions to file, and that was for his lawyer to decide.

**The Court's Ruling**

The court stated this case presented a "unique situation" but denied appellant's motion to vacate. The court found that at the time of his plea, appellant's goal was to receive felony probation and the least amount of time in custody as possible. "But at that time when [appellant] took his plea, I believe [he] believed he was a [United States] citizen and didn't have immigration consequences."

The court stated the question was whether appellant made a prejudicial error under section 1473.7 and would have refused to take the plea if he had known that he was not a citizen. The court stated:

> "At the time [appellant] changed his plea in this case in 2008, he had been in this country for about 3 years. His … father was already here in this country. So [appellant] had been living in … another country before coming into the United States when he was 18 [years old]. And he was here for 3 years when he entered into the plea to the [section] 288 …. This Court's belief that [appellant] at the time of the case had admitted culpability, or that is what's before this court now that he admitted culpability, and that it was a strong case for the People. [Appellant's] chances at trial would be slim. And so [appellant] was at that point … as

occurred. (§ 1473.7, subd. (b)(1).) A motion may be deemed untimely if not filed with "reasonable diligence" after the later of the following: (1) the moving party received a notice to appear in immigration court that asserts the conviction as the basis for removal; (2) notice that a final removal order against the moving party has been issued. (§ 1473.7, subd. (b)(2); see *People v. Perez* (2021) 67 Cal.App.5th 1008, 1015–1016.)

Appellant's motion was timely filed because he was no longer in criminal custody, he had received a notice to appear in immigration court in March 2022, a final removal order had not yet been issued, and he filed his motion in August 2022.

the case was progressing before he pled was looking to mitigate the amount of time he would have [to] spend in custody. His goal was to be able to get a disposition in this case that would entail as little time as possible. I think that is what I gather from the information before me. And so he pled for a low term as a lid, a 3[-]year prison commitment as a lid and was hoping to get felony probation with some local time. He was [in] this country at that time a relatively short amount of time, 3 years. I think he indicated that he didn't speak English well and has become more competent in English .…"

"The question again for the Court is has the defense shown by a preponderance of the evidence that there is a reasonable probability that [appellant] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences. If [appellant] had not been under the mistaken belief that he was citizen, and that by pleading to this disposition would have resulted in him being deported would he have rejected the plea."

"Given the information before this court that [appellant] had admitted culpability, *that his chances at trial would have been slim, that it was a strong case for the People, and [appellant's] goal at that time was to mitigate the time that he was going to be spending in custody* as well as the amount of time that he had been in this country at that time, which had been around 3 years, which relatively speaking is not a long period of time, I'm going to find that the defense has not met its burden by a preponderance of evidence, that there is a reasonable probability that [appellant] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences." (Italics added.)

On October 21, 2022, appellant filed a timely notice of appeal from the trial court's denial of his section 1473.7 motion to vacate his conviction, and he requested and received a certificate of probable cause.

## **ISSUES**

I.    Section 1473.7

II.   Appellant's failure to meaningfully understand the immigration consequences

III.  Prejudicial error

## DISCUSSION

### I.      Section 1473.7

We begin with the provision of section 1473.7, subdivision (a), that states a person

who is "no longer in criminal custody may file a motion to vacate a conviction or

sentence" for the following reason:

> "The conviction or sentence is legally invalid due to prejudicial error
> damaging the moving party's ability to meaningfully understand, defend
> against, or knowingly accept the actual or potential adverse immigration
> consequences of a conviction or sentence.  A finding of legal invalidity
> may, but need not, include a finding of ineffective assistance of counsel."
> (§ 1473.7, subd. (a)(1).)[10]
>
> "The court shall grant the motion to vacate the conviction or sentence if the
> moving party establishes, by a preponderance of the evidence, the existence
> of any of the grounds for relief specified in subdivision (a).  For a motion
> made pursuant to paragraph (1) of subdivision (a), the moving party shall
> also establish that the conviction or sentence being challenged is currently
> causing or has the potential to cause removal or the denial of an application
> for an immigration benefit, lawful status, or naturalization." (§ 1473.7,
> subd. (e)(1).)

The trial court may set aside a conviction based on counsel's immigration advisement

errors without a finding of ineffective assistance of counsel.  (*People v. Ruiz* (2020)

49 Cal.App.5th 1061, 1067.)

> "To prevail under section 1473.7, a defendant must demonstrate that
> his conviction is 'legally invalid due to prejudicial error damaging [his or
> her] ability to meaningfully understand, defend against, or knowingly
> accept the actual or potential adverse immigration consequences of a
> conviction or sentence.' [Citation.]  The defendant must first show that he
> did not meaningfully understand the immigration consequences of his plea.
> Next, the defendant must show that his misunderstanding constituted
> prejudicial error.  '[P]rejudicial error … means demonstrating a reasonable

---

**10**      Section 1473.7 states two additional grounds that are not at issue in this case, where a
person no longer in custody may file a statutory motion to vacate based on the claim there is
"[n]ewly discovered evidence of actual innocence," or that a conviction or sentence was "sought,
obtained, or imposed on the basis of race, ethnicity, or national origin." (§ 1473.7,
subd. (a)(2), (3).)

probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 319, second bracketed insertion added (*Espinoza*); accord, *Vivar*, *supra*, 11 Cal.5th at p. 529.)

In reviewing a section 1473.7 motion, " '[a] "reasonable probability" "does not mean more likely than not, *but merely a reasonable chance*, more than an abstract possibility." ' " (*People v. Soto* (2022) 79 Cal.App.5th 602, 610, italics added, cited with approval in *Espinoza*, *supra*, 14 Cal.5th at pp. 321–322.)

A section 1473.7 motion will not always be granted "merely because the [moving party] claims to have misunderstood the consequences of a plea." (*Alatorre*, *supra*, 70 Cal.App.5th at p. 769.) "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." (*Lee v. United States* (2017) 582 U.S. 357, 369.)

"A defendant must provide ' " 'objective evidence' " ' to corroborate factual assertions. [Citation.] Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, *supra*, 14 Cal.5th at p. 321; accord, *Vivar*, *supra*, 11 Cal.5th at pp. 530–531.)

> "A party seeking relief under section 1473.7 is not required to provide the declaration of plea counsel. [Citation.] Nor is a defendant required to submit contemporaneous documentation from the time of the plea. Rather, the inquiry under section 1473.7 requires consideration of the 'totality of the circumstances,' which necessarily involves case-by-case examination of the record [citation], and no specific kind of evidence is a prerequisite to relief. As noted, the burden rests with the defendant to establish entitlement to relief. In addition to submitting declarations, both parties are entitled to request an evidentiary hearing. [Citation.] The more robust and inclusive a record, the greater the opportunity for effective persuasion and meaningful judicial review. And the inquiry into a defendant's state of mind may often involve the weighing of credibility and circumstantial evidence." (*Espinoza*, *supra*, 14 Cal.5th at p. 325.)

"We apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences.  [Citation.]  ' "[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." '  [Citation.]  When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [trial court] heard and observed.' " '  [Citation.]  But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Espinoza*, *supra*, 14 Cal.5th at pp. 319–320, second bracketed insertion in original; accord, *Vivar*, *supra*, 11 Cal.5th at pp. 527–528.)  "Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Vivar*, at p. 528.)

## II. Appellant's Failure to Meaningfully Understand the Immigration Consequences

The first question under section 1473.7, subdivision (a)(1) is whether appellant met his burden to establish "he did not meaningfully understand the immigration consequences of his plea." (*Espinoza*, *supra*, 14 Cal.5th at p. 319; accord, *Vivar*, *supra*, 11 Cal.5th at p. 529.)  "[T]he focus of an inquiry in a section 1473.7 motion is on the '*defendant's own error* in … not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States.' " (*People v. Mejia* (2019) 36 Cal.App.5th 859, 871.)

### A.  *Section 1016.5 Advisement*

In determining the merits of a section 1473.7 motion to vacate, a statutorily valid section 1016.5 advisement may be insufficient to mitigate the prejudice resulting from a defendant's erroneous beliefs about the impact of his plea on mandatory immigration consequences, since it states that deportation may be a possibility.  (*Vivar*, *supra*,

11 Cal.5th at p. 533.) In this case, however, appellant received a section 1016.5 advisement in the plea and waiver of rights form that went beyond the statutory "possibility" language and instead stated that if he was not a citizen, his plea "*will result*" in his "deportation, exclusion from admission, or denial of naturalization pursuant to the laws of the United States." (Italics added.)

As we will explain, even though the immigration advisement went beyond the requirements of section 1016.5, appellant met his burden to show his own subjective error—that he did not meaningfully understand his plea would subject him to adverse immigration consequences.

## B.     *Appellant's Passport*

The record contains overwhelming objective evidence to corroborate appellant's claim that he reasonably believed he was a citizen when he entered his plea in 2008. While appellant's understanding of derivative naturalization and his actual status was legally erroneous, it is undisputed appellant held a valid passport issued by the Department from 2006 to 2012. As explained above, under federal law, "Congress authorized passport holders to use the passport as conclusive proof of citizenship." (*Magnuson v. Baker*, *supra*, 911 F.2d at p. 333.)

There is no evidence appellant engaged in fraud or perjury when he applied for the passport. Appellant declared, without contradiction, that at the time of the criminal charges and his plea in 2008, he had never received notice from any governmental agency that he was not a citizen, or the passport was mistakenly issued to him, and there is no evidence to contradict that declaration. In his declaration and at the evidentiary hearing, appellant stated the federal government notified him by letter in 2012 that his passport "had been suspended because the government stated that they had issued it to [appellant] *by mistake*," and he surrendered it as ordered. (Italics added.) DHS's report about appellant's arrest by ICE agents in 2014 similarly stated his passport was

"erroneously issued" and surrendered back to the Department; it did not state that he committed any acts of fraud or perjury to obtain the passport.

At the evidentiary hearing, the district attorney presented the passport application to appellant and asked him to review it. Appellant testified he was not fluent in English when he filled out the form, his father helped him, and appellant wrote down most of the information. Upon reviewing the application, appellant testified he did not answer the questions about whether his mother and father were citizens and believed the federal government knew his father was already a citizen. The district attorney did not rely on this testimony or present evidence to argue that appellant engaged in fraud or committed perjury when he applied for the passport, and the court did not make any such finding.

Appellant further declared, without contradiction, that when he was charged in the criminal case, his defense attorney, Mr. Greene "inquired as to my immigration status. In response, I told him that I was a U.S. citizen. *I also showed him my U.S. passport that I had at the time. In substance, his response was essentially 'great, you're a U.S. Citizen', and that was the extent of any discussion that he and I had about my immigration status during the course of his representation of me. As a result, Mr. Greene never discussed or brought up the subject of immigration consequences at all*." (Italics added.)

Appellant's testimony at the evidentiary hearing was consistent with his declaration—that Mr. Greene asked about his immigration status shortly after he retained him, appellant showed his passport to Mr. Greene, and Mr. Greene said, " 'Oh, great you're a [United States] citizen.' And that was the extent of it." Appellant told Mr. Greene how important it was for him to remain in the United States, and Mr. Greene told appellant that it was not an issue because he was an American citizen.

Appellant acknowledged that he read the immigration warning in the advisement and waiver form that he signed before he entered his plea, but he did not believe the admonishment applied to him "because I objectively believed that I was a U.S. citizen." Appellant believed that the federal government could not deport or remove individuals

31.

for a criminal conviction once they obtained citizenship, so he was not concerned about possible immigration consequences and did not investigate what those consequences could be, "since I believed at that time that I was a U.S. citizen, and thus could not be deported."

### C. *The District Attorney's Arguments*

"A defendant must provide ' " 'objective evidence' " ' to corroborate factual assertions. [Citation.] Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, *supra*, 14 Cal.5th at p. 321; accord, *Vivar*, *supra*, 11 Cal.5th at pp. 530–531.) While appellant's declaration and testimony about his passport were not contradicted, the district attorney argued at the evidentiary hearing that appellant's beliefs about his legal status were not credible or reasonable. The district attorney's arguments were refuted by the objective existence of appellant's passport, the undisputed evidence that he lawfully held it at the time of his plea in 2008, and he was not notified that it was erroneously issued to him until 2012, after he was released from prison.

The district attorney also asserted appellant's beliefs about his citizenship status were not credible because he "essentially blindly went ahead with this belief that he was a citizen despite all of these … war[n]ing signs along the way," since he was notified about the immigration hold while he was in prison in 2011, the federal government revoked his passport in 2012, and he was arrested by ICE in 2014. The district attorney argued that there were "warning signs, and [appellant] still … had a blind belief that he was, for whatever reason, a Naturalized citizen," and he "buried his head in the sand despite … all of these warning signs. *He did so because in his mind he prioritized that plea deal above all else*, and he was sticking with the plea deal and really does not appear to care about the immigration consequences until now here we are in 2022, and it is

14 years after he entered the plea. So I do think that does reflect on his credibility." (Italics added.)

The district attorney's arguments about appellant's knowledge and/or conduct from 2011 to 2014, and the impact of his actions on his credibility, were not relevant to the question presented by section 1473.7, subdivision (a)(1), because "[t]he key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—*at the time the plea was taken*" in 2008. (*People v. Mejia*, *supra*, 36 Cal.App.5th at p. 866, italics added.) Appellant's conduct after the plea, and after he was released from prison in 2011, does not undermine the undisputed evidence that he reasonably believed he was a citizen when he entered his plea because he had a validly issued passport.

In addition, the district attorney's complaints that appellant failed to move to withdraw his plea after he was arrested by ICE in 2014 are contradicted by the fact that section 1473.7 was enacted in 2016 and became effective in 2017, and appellant's motion to vacate was timely filed under the provisions of the statute. (See *Alatorre*, *supra*, 70 Cal.App.5th at pp. 752–753; *People v. Perez*, *supra*, 67 Cal.App.5th at pp. 1015–1016; § 1473.7, subd. (b)(1), (2).)

### D. *The Trial Court's Findings*

As explained above, we apply independent review and exercise our independent judgment to determine whether the facts satisfy the rule of law in a section 1473.7 motion. (*Espinoza*, *supra*, 14 Cal.5th at p. 319; accord, *Vivar*, *supra*, 11 Cal.5th at p. 527.) In doing so, we "must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [trial court] heard and observed.' " ' " (*Espinoza*, at p. 320; accord, *Vivar*, at p. 527.) While appellant testified at the evidentiary hearing, the trial court did not reject the credibility of his testimony and declarations about the existence of his valid passport and his reasonable belief that he was a citizen because he had the passport.

Indeed, the trial court found appellant believed he was a citizen when he entered his plea based on his father's information that appellant became a citizen when he entered the country, and because he applied for and was issued a passport by the Department "which further confirmed his belief, in his mind, that he was a United States citizen." The court found that "at that time when [appellant] took his plea, I believe [he] believed he was a [United States] citizen and didn't have immigration consequences," and appellant's belief he was a citizen was corroborated by his passport. Thus, contrary to the district attorney's arguments, the court did not reject appellant's credibility as to his beliefs about the legal impact of receiving his passport, and the court's findings are supported by appellant's uncontradicted declarations and testimony.

We conclude that while appellant's belief that he was a citizen was legally erroneous, he reasonably believed he was a citizen when he entered his plea in 2008 because the Department issued a valid passport to him in 2006, he had not been informed that the passport was erroneously issued, and he had no factual or legal reason to consider whether he would face immigration consequences as a result of his conviction for any criminal offense since he was already a citizen of the United States. Appellant thus met his burden to establish he did not meaningfully understand the immigration consequences of his plea based on his own error.

### III. Prejudicial Error

The next question is whether appellant met his burden to show prejudicial error. "What someone seeking to withdraw a plea under section 1473.7 must show is more than merely an error 'damaging [his] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences' of the plea. [Citation.] The error must also be 'prejudicial.' " (*Vivar*, *supra*, 11 Cal.5th at p. 528.)

## A.  *Factors to Evaluate Prejudice*

The California Supreme Court has set forth certain factors to determine whether the moving party met his burden to show prejudicial error under section 1473.7, subdivision (a)(1).

"At the heart of the prejudicial error analysis 'is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken.' " (*People v. Lopez* (2022) 83 Cal.App.5th 698, 713–714 (*Lopez*).)

> "To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' [Citation.]  'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' [Citations.]  Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial.  [Citation.]  These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at pp. 320–321; accord, *Vivar*, *supra*, 11 Cal.5th at pp. 529–530.)

> "Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities.  [Citation.]  '[W]hen long-standing noncitizen residents of this country are accused of committing a crime, the most devastating consequence may not be a prison sentence, but their removal and exclusion from the United States.' [Citation.]  Depending on the strength of a defendant's community ties, 'the prospect of deportation' may be ' "an integral part" ' or ' "the most important part" ' of the defendant's 'calculus in responding to certain criminal charges.' [Citation.]  Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment." (*Espinoza*, *supra*, 14 Cal.5th at p. 321, second bracketed insertion in original.)

35.

"Objective evidence of a defendant's community ties includes facts provided by a defendant's declaration or declarations from family members, friends, colleagues, community members, or other acquaintances." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) A court commits error by disregarding the moving party's declaration "on the basis that it did not constitute objective evidence. We made clear in *Vivar* that a defendant's declaration is one form of objective evidence relevant to a prejudicial error inquiry." (*Id.* at p. 322.)

### B. Bravo, Abdelsalam, *and* Lopez

At the evidentiary hearing and on appeal, the People argue appellant failed to prove prejudicial error, similar to the circumstances in *People v. Bravo* (2021) 69 Cal.App.5th 1063 (*Bravo*) and *People v. Abdelsalam* (2022) 73 Cal.App.5th 654 (*Abdelsalam*). Appellant disputes the People's reliance on these cases and argues that *Lopez*, *supra*, 83 Cal.App.5th 698 is dispositive and supports his claim of prejudicial error.

In *Bravo*, the defendant pleaded guilty to felony domestic violence and child cruelty and was placed on probation. (*Bravo*, *supra*, 69 Cal.App.5th at p. 1067.) The victims were his girlfriend and their infant child. (*Id.* at p. 1068.) *Bravo* held the defendant's section 1473.7 motion to vacate his plea was properly denied. (*Bravo*, at pp. 1077–1078.) *Bravo* held the factors required to establish prejudicial error were "conspicuously absent" because the contemporaneous evidence showed the defendant's priority at the time of the plea was to avoid a custodial term so he could keep his job, and "he elected to take the plea bargain to obtain release and return to his girlfriend and son and resume his job. There is nothing to substantiate his claim that had he known of the ultimate immigration consequences he would have refused the plea bargain." (*Id.* at pp. 1074–1075.) *Bravo* concluded "the events to which [the defendant] pleaded guilty in 1997 were *domestic violence and child cruelty felonies against that very girlfriend and son*, undercutting any claim now that he would have put himself in immediate peril of

36.

deportation … by a pending ICE sweep at the jail in order to go to trial in an attempt to avoid later immigration consequences." (*Id*. at p. 1077, italics added.)

In *Abdelsalam,* the defendant arrived in the United States sponsored by his girlfriend "on a fiancé visa" and secretly planned to divorce her once they were married and he gained citizenship. (*Abdelsalam*, *supra*, 73 Cal.App.5th at p. 658.) His girlfriend discovered his plan, ended their relationship, and reported the defendant to immigration authorities. (*Ibid*.) When he learned of her actions, the defendant assaulted her with a knife. (*Ibid*.) He was charged with multiple offenses and faced 10 years in prison. (*Id*. at pp. 658–659.) The defendant pleaded no contest to one count and was placed on probation for five years. (*Id*. at p. 659.) At the plea hearing, the court specifically advised the defendant, " 'If you are not a citizen of the United States *your plea will result in your deportation*, denial of naturalization and amnesty, and exclusion from the United States,' " as a result of the plea if he was not a citizen. (*Id*. at p. 660.) The defendant said he understood but was " 'just going to wait for immigration.' " (*Ibid*.) He was later detained by federal immigration authorities and filed a section 1473.7 motion to vacate his plea, and it was denied. (*Abdelsalam*, at p. 659.)

*Abdelsalam* held the defendant failed to establish prejudicial error because he "had just arrived here. *And he was admitted on a fraudulently procured fiancé visa, with an intent to gain citizenship by deception*. In the short time he was here, [he] engaged in conduct that got him arrested for stalking, assaulting, burglarizing, and threatening the person who had made his presence here possible. She wanted him deported. Deportation agents literally sat in on his preliminary hearing. He faced 10 years in prison, and now claims he would have somehow avoided deportation and rejected the plea agreement that resulted in only a few months of additional custody." (*Abdelsalam*, *supra*, 73 Cal.App.5th at p. 665, italics added.)

In contrast to *Bravo* and *Abdelsalam*, the court in *Lopez* found the defendant in that case met his burden to prove prejudicial error. (*Lopez*, *supra*, 83 Cal.App.5th at

37.

p. 719.) The defendant came to the United States when he was 13 years old, grew up in this country, completed high school, and became a lawful permanent resident. (*Id*. at p. 706.) In 1998, when he was 22 years old, the defendant was charged with four counts of second degree robbery and one count of attempted second degree murder. (*Id*. at p. 705.) The robberies were committed by an accomplice, while the defendant was the getaway driver and provided the air pellet gun that the accomplice used during the offenses. (*Id*. at p. 704.)

At the time the defendant in *Lopez* was charged, he had a stable employment and residential history, and financially supported his mother. (*Lopez*, *supra*, 83 Cal.App.5th at p. 705.) The defendant had never been previously arrested, and he did not have any prior convictions or experience with the criminal justice system. (*Id*. at p. 707.) The defendant's family retained an attorney, David Kwan, to represent the defendant, but Mr. Kwan never asked the defendant about his immigration status. Mr. Kwan had died by the time the defendant filed his motion to vacate (*id*. at p. 718, fn.10), but the defendant declared Mr. Kwan thought the defendant was a citizen and never mentioned that adverse immigration consequences could result from the plea (*id*. at pp. 706–707). The defendant further declared that Mr. Kwan did not explain the significance of a noncitizen being convicted of an aggravated felony under federal immigration law, and Mr. Kwan did not tell the defendant that he would lose his lawful permanent resident status if he pleaded to robbery. Instead, Mr. Kwan only discussed the seriousness of the defendant's case, how much time he was facing if convicted, and the defendant's goal of trying to get jail time and avoid state prison. (*Id*. at p. 707.)

The defendant in *Lopez* pleaded no contest to one count of second degree robbery and was sentenced to the lower term of two years. (*Lopez*, *supra*, 83 Cal.App.5th at pp. 705–706.) The defendant received the section 1016.5 advisement at the plea hearing, but he incorrectly presumed the warning did not apply to him because he was a lawful permanent resident. (*Ibid*.) The defendant first learned of the mandatory immigration

consequences of his conviction when he was deported to Mexico. (*Id*. at p. 707.) Thereafter, the defendant filed a section 1473.7 motion to vacate his plea and argued that he did not appreciate the seriousness of the charge and the mandatory immigration consequences that would occur by entering a plea as a result of his own error and ignorance. (*Lopez*, at pp. 706–707.)

*Lopez* held the trial court erroneously denied the defendant's section 1473.7 motion because the defendant's declaration explained "a reasonable basis for his erroneous belief that he would not be subject to adverse immigration consequences: In the absence of any advice from counsel, [the defendant] incorrectly assumed that his status as a lawful permanent resident of the United States shielded him from any *possible* adverse immigration consequences mentioned by the prosecutor at his plea hearing. At the time of his plea, [the defendant] was only 22 years old and had no previous encounters with the criminal justice system during which he might have received legal advice about the immigration consequences of a conviction. [His] lawyer never asked about his immigration status, nor did he mention that a conviction for robbery constitutes an aggravated felony under federal immigration law which would subject appellant to mandatory deportation. The record also reveals no effort by his attorney to negotiate a plea that would not carry such dire immigration consequences." (*Lopez*, *supra*, 83 Cal.App.5th at pp. 712–713.)

*Lopez* further held the defendant's undisputed declaration established his error was prejudicial because his "personal history, deep ties to the United States, and at the time of his plea, his youth and lack of experience with the criminal justice and immigration systems sufficiently corroborate [his] claim that his ability to remain in the United States with his family was a paramount concern. In the absence of any legal advice about the dire immigration consequences that would follow from his plea and conviction, [he] accepted a plea to an aggravated felony in the mistaken belief that the warning about

39.

possible adverse immigration consequences did not apply to him because of his lawful permanent resident status." (*Lopez*, *supra*, 83 Cal.App.5th at p. 719.)

### C. *Analysis*

We find that, as in *Lopez*, appellant met his burden to show prejudicial error. Appellant's background and circumstances are similar to those found sufficient in *Lopez*. Appellant legally entered the United States in 2005 when he was 18 years old as a lawful permanent resident and lived with his family in Bakersfield. Appellant was regularly employed, initially worked with his father in Bakersfield, went to other states and worked for various family members, and then returned to Bakersfield and worked at convenience stores. He did not have any prior convictions. As explained above, he obtained a valid passport and reasonably believed he was a citizen. In contrast to *Abdelsalam*, *supra*, 73 Cal.App.5th 654, there is no evidence he committed any fraud or perjury when he entered the country and applied for the passport.

In 2008, appellant was charged with committing lewd and lascivious acts on a minor, who was his girlfriend's son. His statements at the time of his plea and sentence indicated that he hoped for probation and/or a minimal custodial term so he could continue to support his family since his father was on disability and unable to work. While appellant had been in the United States for less time than the defendant in *Bravo*, he did not claim he wanted to avoid a custodial sentence so he could support *the victims* of his crime.

The trial court denied appellant's section 1473.7 motion because the record showed that at the time of his plea, appellant "was looking to mitigate the amount of time he would have [to] spend in custody" and get a disposition "that would entail as little time as possible," and he agreed to the plea agreement for either probation or the lower term of three years.

We agree with the trial court that at the time of his plea in 2008, appellant's primary concern was to minimize his time in custody so he could continue to financially

40.

support his family, based on his statements in the probation report and the section 288.1 psychological evaluation. Appellant's intent at the time of the plea, however, must be considered in light of the undisputed evidence that at the same time, he reasonably believed he had a valid passport that was issued by the Department, which meant he was a citizen, and he could not be deported or removed from the United States regardless of the nature of the charged offense, a possible plea agreement, or a conviction after trial. As in *Lopez*, appellant's declarations and testimony on this point were undisputed.

In his supporting declaration, appellant stated that if he had known about his actual immigration status at the time of his plea and faced deportation, he would have immediately rejected the plea bargain, consulted with an immigration attorney, directed his attorney to negotiate an immigration-safe plea agreement even if it meant serving additional time in prison, or gone to trial and accepted the risk of a higher prison term. "Even if I had to do a state prison sentence for a number of years, I still did not want to permanently leave the U.S. and my family behind, and potentially never see them again or … be unable to take care of my father." Appellant declared he would have been sent back to an area of Jerusalem that, "as a practical matter," was controlled by extremist militia groups and his situation would have been "calamitous" because his conviction for committing a sex crime against a child could result in his torture or death by these groups.

Appellant did not present any evidence or arguments about potential "immigration-neutral" pleas that might have been available at the time of his plea in 2008. However, "[a] decision to reject a plea bargain … 'might be based either on the desire to go to trial or on the hope or expectation of negotiating a different bargain without immigration consequences.' [Citation.] When a court weighs whether a defendant would have taken the latter path, it need not decide whether the prosecution would actually 'have offered a different bargain'—rather, the court should consider

41.

'evidence that would have caused *the defendant* to expect or hope a different bargain would or could have been negotiated.' " (*Vivar*, *supra*, 11 Cal.5th at p. 529.)

The court also found appellant failed to meet his burden to show prejudicial error because he had already admitted his culpability to the charged offense during the investigation, the prosecution had a strong case, his chances at trial "would be slim," and the plea achieved his goal of minimizing the time he was going to spend in custody. These factors, however, are not dispositive. "[W]hile the probability of obtaining a more favorable result at trial may be one factor a court considers in determining prejudice, it is not controlling or necessarily even the most important factor courts consider. [Citations.] Indeed, the United States Supreme Court has declared that where avoiding deportation was *the* deciding factor for a defendant, there is a reasonable probability that such a defendant 'would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial.' " (*People v. Lopez*, *supra*, 83 Cal.App.5th at pp. 714–715, quoting *Lee v. United States*, *supra*, 582 U.S. at pp. 367–368.)

"Because the prospect of deportation 'is an integral part,' and often even 'the most important part,' of a noncitizen defendant's calculus in responding to certain criminal charges [citation], both the Legislature and the courts have sought to ensure these defendants receive clear and accurate advice about the impact of criminal convictions on their immigration status, along with effective remedies when such advice is deficient." (*Vivar*, *supra*, 11 Cal.5th at p. 516.) We conclude appellant's error was prejudicial because his goal at the time of his plea, to minimize his custodial time, was based on his reasonable but legally erroneous belief that he was a citizen and could not be deported under any circumstances, regardless of the nature of the charges or conviction. In reaching this conclusion, we acknowledge the seriousness of the offense that he was charged with and pleaded to but cannot ignore the unique circumstances that were created

by the federal government's erroneous issuance of the passport to appellant in 2006 and failure to correct that error until 2012, four years after he entered his plea.

## DISPOSITION

The trial court's order denying appellant's section 1473.7, subdivision (a)(1) motion to vacate his plea and conviction is reversed, and the matter is remanded for further appropriate proceedings.

HILL, P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.

43.